CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
AUG 08 2006
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| NATHAN L. SURBER,<br>Plaintiff, | Civil Action No.: 1:05cv00076 |
| v. | **MEMORANDUM OPINION** |
| JO ANNE B. BARNHART<br>COMMISSIONER OF<br>SOCIAL SECURITY,<br><br>Defendant. | By: GLEN M. WILLIAMS<br>Senior United States District Judge |

In this social security case, the court vacates the final decision of the Commissioner denying benefits and remands this case to the Commissioner for further development consistent with this Memorandum opinion.

*I. Background and Standard of Review*

The plaintiff, Nathan L. Surber, ("Surber"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Surber's claims for a period of disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 and Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966.) "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws,* 386 F.2d at 642.)

The record shows that Surber filed an application for DIB an SSI on December 2, 2003. (Record, ("R"), at 72-74, 496-98) Surber filed for DIB and SSI due to lateral femoral cutaneous and/or genitofemoral nerve injury, right leg pain and burning and stabbing in his right foot and toes. (R. at 81.) His claim was denied initially and on reconsideration. (R. at 58-59, 499-500.) Surber then requested a hearing before an administrative law judge ("ALJ"). (R. at 70-71.) The ALJ held a hearing on February 3, 2005, during which Surber appeared and was represented by counsel. (R. at 38-57.)

By decision dated March 28, 2005, the ALJ denied Surber's claim. (R. at 13-30.) The ALJ found that Surber had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 25.) Further, the ALJ determined that Surber had an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520 and 416.920. (R. at 25.) However, the ALJ determined that Surber's medically determinable impairments

Case 1:05-cv-00076-JPJ-PMS Document 16 Filed 08/08/06 Page 2 of 19 Pageid#: 71

did not meet or medically equal on of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. at 25.) The ALJ found that Surber's allegations regarding his limitations were not totally credible. (R. at 25.) The ALJ determined that Surber retained the residual functional capacity to perform the full range of light work[1], and his impairments did not prevent him from performing his past relevant work. (R. at 25-26.) Thus, the ALJ found that Surber was not under a disability as defined by the Act, at any time through the date of the decision. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e).

After the ALJ issued his opinion, Surber pursued his administrative appeals, (R. at 11-12), but the Appeals Council denied his request for review. (R. at 5-8.) Surber then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.1520 and 416.1481.

## *II. Facts*

At his hearing, Surber testified that his date of birth was May 20, 1962, and he was 42 years old. (R. at 41.) He said that he did not have his GED, and he only had a ninth grade education. (R. at 41.) Surber testified that his past work experience involved welding, and his last welding job was in Smith County. (R. at 41-42.) He said that welding required him to lift objects weighing more than 50 pounds. (R. at

---

[1]The Regulations define work in terms of the exertion required. Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in the this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls. If an individual can perform light work, he can also perform sedentary work. 20 C.F.R. §§ 404.1567(d) and 416.967(b) (2005).

-3-

42.) Surber also testified that he had worked for Titan Wheel as a process technician. (R. at 42.) The Titan Wheel job, according to Surber, was not a skilled position, and it also required lifting objects weighing more than 50 pounds. (R. at 42-43.) Next, Surber testified that he had worked for Clean Right Services for six months, where he was a cleaner who cleaned K-Mart Stores. (R. at 43.) According to Surber, the Clean Right Services job only required lifting objects weighing less than 20 pounds. (R. at 43.) Surber said his only other past relevant work was as a concrete worker on a construction site. (R. at 43.) Surber testified that his construction experience was only as a carpenter's helper, and he could not read blueprints. (R. at 44.)

The ALJ next questioned Surber as to why he was unable to work, and Surber testified that the reason he was unable to work was because of pain. (R. at 44.) Specifically, Surber testified that he had pain in his right leg and thigh area. (R. at 44.) He said that he also had back pain and possibly a slipped disc, but he had never had back surgery. (R. at 44.) However, Surber testified that he had hernia surgery. (R. at 45.) The ALJ then asked Surber to rank the pain he experiences on a scale of two to 10, with 10 indicating an excruciating pain level, and Surber said that his pain was a seven or eight. (R. at 46.) Surber said that he takes hydrocodone to alleviate his pain. (R. at 46-47.)

Surber testified that he infrequently drove a car to the grocery store. (R. at 47.) He said that he does not help with housework, and he occasionally mows the yard. (R. at 47.) He stated that his hobbies included hunting and fishing, but due to the pain he was no longer capable of hunting. (R. at 47-48.) Surber said that he had no social life, and he generally keeps close to home. (R. at 49.)

The ALJ asked Surber what his height and weight were, and Surber said that he was six feet tall and weighed 212. (R. at 48.) Surber said that he had gained weight, and he attributed the weight gain to inactivity. (R. at 48.) Surber stated that he did not know if he would, eventually, return to work, but he would like to. (R. at 49.)

Surber's attorney questioned him about his previous employment with Clean Right. (R. at 49.) Surber stated that he took out the trash and waxed floors. (R. at 49.) Surber said waxing the floor required him to hang on the floor buffer, and the buffer weighed 100 pounds. (R. at 50.)

Surber said that his pain intensity fluctuates, and he could find relief by lying or sitting with his legs outstretched. (R. at 50.) He said that activity makes his pain increase. (R. at 50.) Surber said that lifting, bending, stooping and walking affect his pain level. (R. at 50-51.)

Surber confirmed his lawyer's assertion that he takes Neurontin for pain management, Amitriptyline to help him sleep and Lexapro for depression and nerves. (R. at 52-54.) He said that since he began taking Amitriptyline, he sleeps, on average, six hours a night. (R. at 53.) Surber also confirmed his lawyer's assertion that he had trouble with his memory, attention span and concentration. (R. at 54.) Also, he does not like crowds and had lost interest in activities that he previously enjoyed. (R. at 54.)

Surber stated that his right heel was numb and he also had high blood pressure.

(R. at 55.) He said that on average he lied down most of the day and usually was only on his feet for a total of two hours. (R. at 56.) Surber testified that standing, walking and sitting increased his pain intensity, and laying down did not completely relieve his pain.

In rendering his decision, the ALL reviewed medical records from Dr. Jacinth Alvarado, M.D.; Bristol Neurosurgical Associates; John M. Marshall, M.D.; Dr. George Patterson, M.D.; Lewis Gale Clinic, L.L.C.; The Pain Management Center of Roanoke; Weaver, Vascik, Kleiner & Harron; Carilion Roanoke Memorial Hospital; Johnson Memorial Hospital; Troutdale Medical Center; and Smyth County Community Hospital.

Surber went to Smyth County Community Hospital on May 10, 2002. (R. at 151.) He complained of right groin pain, which started after he helped a co-worker lift a 200-pound object. (R. at 151.) The attending physician did not find a hernia but informed Surber that hernia's, at times, did not appear for up to two weeks after an injury. (R. at 151.)

Surber was seen by Dr. Alvarado on May 15, 2002. (R. at 145.) Surber complained of pain in his right groin and inguinal abdomen region. (R. at 145.) Dr. Alvarado noted that there was bulging on the right side which was indicative of a direct inguinal hernia. (R. at 145.) On June 2, 2003, Dr. Alvarado noted that an MRI, date unknown, suggested that Surber suffered from a bulging disc at the L5-S1 level. (R. at 144.) Surber was seen by Dr. Alvarado on June 25, 2003 and July 10, 2003. (R. at 139-40.) At both appointments Dr. Alvarado noted that Surber should avoid

Case 1:05-cv-00076-JPJ-PMS   Document 16   Filed 08/08/06   Page 6 of 19   Pageid#: 75

weight gain, and he did not seem willing to improve his condition through physical therapy. (R. at 139-40.) Dr. Alvarado treated Surber on August 8, 2003, and noted that Surber had been improving with the use of a TENS unit. (R. at 138.) Dr. Alvarado noted that Surber had gained 30 pounds in the last year and now weighed 189 pounds. (R. at 138.) He further noted that he believed that Surber's condition was temporary. (R. at 138.) On September 9, 2003, Surber was seen by Dr. Alvarado. (R. at 135.) Surber complained of right hip and leg pain. (R. at 135.) Dr. Alvarado noted that he did not believe that Surber was willing to work with the physical therapist and because of his unwillingness to work with the physical therapist he believed he had nothing more to offer Surber. (R. at 135.) Also, Dr. Alvarado determined that Surber's condition was a pain management condition and advised that he seeks treatment with Dr. Marshall. (R. at 135.)

Surber was referred to Dr. Lyle W. Bauman, M.D., by Dr. Alvarado, for hernia repair on June 17, 2002. (R. at 195-204.) Since the surgery, he consistently reported continued epididymal pain in his right groin area to Dr. Bauman, and Dr. Bauman treated Surber with trigger point injections and Lortab. (R. at 171-76, 181, 184-88.) In a letter, dated August 20, 2002, to Dr. Bauman, from Terri Newman, consultant, Newman diagnosed Surber with epidimitis, which was possibly caused by scar tissue around the nerve. (R. at 177.) Newman's prognosis of Surber was good, and she recommended that Surber continue trigger point injections. (R. at 177.) On October 1, 2002, Surber was seen by Dr. Bauman. (R. at 172.) He reported to Dr. Bauman that he was doing markedly better and that his groin was only tender with palpation. (R. at 172.)

-7-

On June 14, 2002, Surber was seen at the smyth County Community Hospital emergency room, and he complained of abdomen pain. (R. at 192.) A CT scan was taken of Surber's abdomen and the results were unremarkable. (R. at 193.) A left lateral chest x-ray also was taken, and the impression was chronic obstructive pulmonary disease, ("COPD"). Surber went to Smyth County Community Hospital's emergency room, on August 27, 2002, and complained of right hip and thigh pain. (R. at 189.) An x-ray of Surber's right femur was taken and revealed multipartite ossifications in the center of his patella. (R. at 190.) The impression from the x-ray was no destructive lesion or fracture. (R. at 190.) An x-ray of Surber's right hip also was taken and it revealed no destructive lesion or fracture. (R. at 191.)

Surber was referred to urologist, Dr. Edward J. Moskowitz, M.D., on July 31, 2002. (R. at 211-15.) Surber presented to Dr. Moskowitz swelling and pain in his right testicle. (R. at 211.) Dr. Moskowitz's impression was either Surber suffered from cord entrapment syndrome or an inflammatory syndrome. (R. at 212.)

On August 8, 2002, Surber was seen at the Smyth County Community Hospital's emergency room, and he complained of epididymitis. (R. at 220.) A testicular ultrasound was performed, and the impression was bilateral acute epididymo-orchitis, cysts of the epididymides compatible with epididymal cysts or spermatoceles and bilateral varicoceles, left larger than the right. (R. at 221.) On August 9, 2002, Surber underwent a cystopanendoscopy at Smyth County Community Hospital. (R. at 223-27.) The impression was severe prostatovesiculitis. (R. at 224.) On September 6, 2002, Surber went to Smyth County Community Hospital and complained of prostatitis. (R. at 216.) An MRI of his lumbar spine was taken, and

the impression was small central and left sided herniated nucleus pulposus at the L5-S1 level. (R. at 217.) Also, this disc appeared to touch the anterior margin of the left S1 nerve root sleeve but without significant displacement or effacement of the structure. (R. at 217.) A x-ray of Surber's lumbar spine also was taken with no destructive lesion or fracture seen. (R. at 218.)

Surber was seen by Dr. George Patterson, M.D., on September 3, 2002. (R. at 228-29.) An exam, by Dr. Patterson, demonstrated that Surber was not in acute distress. (R. at 229.) Dr. Patterson recommended that Surber wait and see if his pain resolves itself on its own as opposed to surgery. (R. at 228.)

A letter dated May 6, 2003, from Dr. Fredrick Swartzendruber, M.D., to Dr. Marc Swanson, M.D., Dr. Swartzendruber noted that Surber still experienced pain in his right leg radiating down the lateral right thigh to below his knee. (R. at 233-34.) Dr. Swartzendruber further discussed the findings of Dr. Vascik and noted that Surber likely suffers from chronic pain syndrome resulting from and related to involvement of the right lateral femoral cutaneous nerve. (R. at 233.)

Dr. Swartzendruber treated Surber on April 8, 2003, March 13, 2003, February 11, 2003. (R. at 239, 244, 247, 251.) Surber complained of severe right leg pain to Dr. Swartzendruber at the appointments. (R. at 239, 244, 247, 251,.) Dr. Swartzendruber noted that the leg pain could be caused by Surber's lumbar disc disease and recommended that he get a second opinion from a neurosurgeon. (R. at

Case 1:05-cv-00076-JPJ-PMS Document 16 Filed 08/08/06 Page 9 of 19 Pageid#: 78

239.) On January 5, 2004, Surber was seen by, Dr. Swartzendruber at the Lewis-Gale Clinic. (R. at 230-31.) This was a one-year follow-up of surgery that removed a right groin prosthetic patch, which had been stapled in and had been complicated by severe postoperative pain that was determined to be from both deep staples in periosteum as well as staples involving sensory nerves in the right inguinal canal. (R. at 230.) Dr. Swartzendruber's diagnostic impression was a normal right groin examination. (R. at 230.)

Surber was seen by Dr. Marc A. Swanson, M.D., at the Pain Management Center of Roanoke on September 24, 2002. (R. at 265-67.) In Dr. Swanson's opinion, the right leg pain that Surber was experiencing was caused by the intermittent compression of his lateral femoral cutaneous nerve, and it would improve on its own. (R. at 266.) Dr. Swanson also noted that he believed that Surber's pain would improve as he returned to work and began to load muscle groups and increase his activities. (R. at 267.) Surber was seen by Dr. Swanson on November 12, 2002. (R. at 285-87.) Dr. Swanson's diagnoses was genital femoral neuralgia, status post mesh implant for right inguinal hernia repair, mechanical irritation of the genital femoral nerve, testicular, inguinal and leg pain and moderate pain and functional disability. (R. at 285.) On May 12, 2003, Surber was seen by Dr. Swanson, and he was diagnosed with lateral femoral cutaneous nerve entrapment on the right, genital femoral neuralgia, improved, status post right inguinal hernia repair with mesh grafting resulting in iliohypogastric and genital femoral nerve impingement, status post removal of mesh grafting and laparoscopic inguinal hernia repair, marked functional improvement, mild progressive dysesthetic pain associated with his lateral femoral cutaneous nerve entrapment on the right and mild pain and functional

Case 1:05-cv-00076-JPJ-PMS   Document 16   Filed 08/08/06   Page 10 of 19   Pageid#: 79

disability. (R. at 271.)

On January 8, 2003, Surber had right inguinal exploration surgery with complete removal of the bard polypropylene patch and attached staples that had previously been inserted during his original hernia surgery. (R. at 310-77.) There were no intra operative complications noted and the procedure was tolerated well. (R. at 312.)

Surber was examined by Dr. Jim Brasfield on January 27, 2003, at the Bristol Regional Neurosurgical Associates. (R. at 384-86.) He was referred to Dr. Brasfield by Dr. Bauman and Dr. Alvarado for the purpose of evaluation of his right leg pain. (R. at 384.) After an examination, Dr. Brasfield ordered several tests and noted that he was concerned that Surber's right L4 nerve root was contributing to his pain. (R. at 386.) On January 29, 2003, Surber was examined by Dr. John Marshall. (R. at 382.) Dr. Marshall's impression was probable right lateral femoral cutaneous nerve palsy Surber was seen by Dr. Brasfield on February 20, 2003. (R. at 378-81.) Dr. Brasfield noted that a previous nerve conduction study indicated that Surber was likely suffering from right lateral femoral cutaneous nerve palsy. (R. at 378.) Dr. Brasfield further noted that Surber's lumbar myelogram and EMG/nerve conduction studies suggested that Surber's pain was related to a genitofemoral nerve neuralgia. (R. at 378.) Dr. Brasfield noted that he agreed with Dr. Swartzendurber in that Surber could return to work starting February 24, 2003. (R. at 379.)

On April 13, 2003, Surber went to the office of Weaver, Vascik and Herron.

-11-

(R. at 393-94.) Surber complained of pain in his right leg and burning in his right foot. (R. at 393.) He reported that his pain, on a scale of one to 10, was a seven. (R. at 394.)

Surber was seen by Dr. John Marshall on September 19, 2003, on referral by Dr. Alvarado. (R. at 402-04.) The purpose of Surber's visit was evaluation of his right leg pain. (R. at 402.) Dr. Marshall assessed Surber with chronic pelvic/inguinal, low back and right leg pain. (R. at 403.) Dr. Marshall noted that going forward he would encourage Surber to be as functional as possible. (R. at 404.)

On November 11, 2003, Surber was treated by Dr. Powers at the Troutdale Medical Center. (R. at 408-10.) Dr. Powers found that Surber suffered from chronic leg pain, lateral femoral cutaneous nerve syndrome and a knot in his right thigh. (R. at 408.) Surber was treated by Dr. Powers on January 14, 2004, and was diagnosed with lumbar radiculopathy. (R. at 406.)

Surber also went to the Smyth County Free Clinic, Inc., on November 11, 2003. (R. at 441.) Surber complained of constant groin pain and was diagnosed with lateral femoral cutaneous nerve palsy. (R. at 441.)

Dr. Alvarado filled out a form for Lotsolutions, Claim Administrators regarding Surber's ability to work on November 18, 2003. (R. at 420-27.) Dr. Alvarado determined that Surber was capable of sedentary work. (R. at 420.) Also, Dr. Alvarado found that Surber was capable of sitting for three to five hours in an

eight-hour day, and Surber was capable of driving for one to three hours in an eight-hour day. (R. at 421.) Further, Dr. Alvarado determined that Surber could repetitive use his hands for grasping, fine manipulation, pushing and pulling, and he could occasionally bend but never squat or climb, and he was able to work but with restrictions. (R. at 421.)

Dr. Richard M. Surrusco M.D., filed out Residual Physical Functional Capacity Assessment on April 3, 2004, which was reviewed by Dr. Frank M. Johnson, M.D., on April 29, 2004. (R. at 411-19.) Dr. Surrusco found that Surber had exertional limitations of occasionally lifting and/or carrying objects weighting 20 pounds, frequently lifting and/or carrying objects weighing 10 pounds, standing and/or walking about six hours in an eight-hour work day, sitting for a total of six hours in an eight-hour day and an unlimited pushing and/or pulling ability. (R. at 412.)

Surber went to the Troutdale Medical Center on July 13, 2004, where he complained of groin pain. (R. at 437.) He said his pain increased after riding in an automobile. (R. at 437.) Suber was referred to Dr. Broglio. (R. at 437.)

Surber was seen by Dr. Frederick Swartzendruber, M.D., at the Lewis Gale Clinic on July 12, 2004. (R. at 429-31.) It was noted that Surber was taking Neurontin, Elavil and Lortab. (R. at 429.) The examination revealed no sign of recurrent hernia and no palpable areas of residual scarring or swelling. (R. at 429.) Dr. Swartzendruber's impression was stable, asymptomatic right groin examination with no evidence of recurrent hernia and asymptomatic atrophy of the right testicle.

-13-

Case 1:05-cv-00076-JPJ-PMS   Document 16   Filed 08/08/06   Page 13 of 19   Pageid#: 82

(R. at 429.) His recommended that Surber continue with the permanent lifting restrictions of lifting less than 25 pounds. (R. at 429.)

Dr. Anthony L. Broglio, M.D., performed flexible cystourethroscopy and bilateral retrograde pyelograms surgery on Surber on August 11, 2004. (R. at 450.) The post operative diagnosis was hematuria. (R. at 450.) Dr. Broglio examined Surber on September 22, 2004. (R. at 442.) Dr. Broglio diagnosed Surber with microhematuria. (R. at 442.) Otherwise, Surber's exam was normal. (R. at 442.)

Surber was seen Dr. William T. Powers, M.D., on July 27, 2004 at the Troutdale Medical Center. (R. at 458.) Surber complained of left heel numbness that started and had been persistent for approximately a week. (R. at 458.) Dr. Powers assessed Surber with paresthesias of the left foot. (R. at 458.) Surber was again seen by Dr. Powers on October 8, 2004, where he again complained of left heel numbness. (R. at 457.) Although Surber reported that the heel numbness was worsening, Dr. Powers's assessment remained unchanged. (R. at 457.) On December 10, 2004, Surber was seen by Dr. Powers at the Troutdale Medical Center. (R. at 456.) He assessed Surber with depression, chronic pain syndrome and prescribed Lexapro. (R. at 456.)

Robert J. O'Donnell, P.T. of The Blankenship System performed a functional capacity evaluation on Surber on December 7, 2004. (R. at 474-82.) Surber's percentile profile was determined to be very poor, which corresponds to a score in the one to 10th percentile in the following areas: occasional torso lift, occasional leg lift,

occasional shoulder lift, occasional overhead lift, occasional carry 30 feet, occasional push 30 feet, occasional pull 30 feet, and he scored average, which corresponds to a 41-59 percentile score, on the left and right-hand grip test. (R. at 479.) Surber's heart rate profile indicated that he had a fair level of cardiovascular fitness. (R. at 480.) Also, it was determined that the movement patterns and behavior had equivocal correlation with his pain profiles, and it was noted that symptom exaggeration was not present. (R. at 481.)

On December 27, 2004, Surber was seen by Renee P. Mason, D.P.M. (R. at 489-91.) Surber presented with right plantar heel pain. (R. at 490.) Mason's impression was heel spur syndrome. (R. at 490.)

Surber went to the Smyth County Community Hospital on January 11, 2005, where he complained of pain. (R. at 460-65.) The impression was small intermittent sliding hiatal hernia, minor intermittent GERD into the distal and it was noted that minimal duodenitis could not be entirely excluded. (R. at 460.)

On January 5, 2005, Surber was seen for a follow-up with Dr. Swartzendruber. (R. at 493-94.) Dr. Swartzendruber's impression was no detectable hernia recurrence in the right groin, dyspepsia with bloating and nausea and possible right foot plantar fasciitis. (R. at 494.)

Dr. Powers filled out a Physical Capacities Evaluation regarding Surber on January 27, 2005. (R. at 452-53.) In an eight-hour work day Dr. Powers determined that Surber was capable of sitting, standing and walking for one hour at a time. (R.

-15-

at 452.) He further found that during an eight-hour work day Surber was capable of sitting, standing and walking for a total of two hours during the work day. (R. at 452.) Dr. Powers found that Surber could continuously lift and carry objects weighting up to five pounds, but Surber could never lift and/or carry objects weighing more than 20 pounds. (R. at 452.) Dr. Powers determined that Surber maintained the use of his hands for simple grasping, pushing and pulling. (R. at 452.) Further, he found that Surber could occasionally bend, squat, crawl, climb and reach. (R. at 452.) Dr. Powers found that Surber was totally restricted in activities involving heights, moderately restricted in activities involving moving machinery and mild restrictions involving driving an automobile. (R. at 452.) Also, Dr. Powers determined that Surber's pain was incapacitating, and his pain would increase in direct correlation with an increase in physical activity. (R. at 453.) Dr. Powers also determined that medication would severely limit Surber's effectiveness in the workplace. (R. at 453.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled

at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 28, 2005, the ALJ denied Surber's claim. (R. at 13-30.) The ALJ found that Surber had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 25.) Further, the ALJ determined that Surber had an impairment or combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. §§ 404.1520 and 416.920. (R. at 25.) However, the ALJ determined that Surber's medically determinable impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. at 25.) The ALJ found that Surbers allegations regarding his limitations were not totally credible. (R. at 25.) The ALJ determined that Surber

-17-

Case 1:05-cv-00076-JPJ-PMS   Document 16   Filed 08/08/06   Page 17 of 19   Pageid#: 86

retained the residual functional capacity to perform the full range of light work[2], and his impairments did not prevent him from performing his past relevant work. (R. at 25-26.) Thus, the ALJ found that Surber was not under a disability as defined by the Act, at any time through the date of the decision. (R. at 26.) *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e).

The ALJ erred in this case by not considering the effects of Surbers non-exertional impairment on his residual functional capacity. *See Coffman v. Bowen,* 829 F.2d 514, 519 (4th Cir. 1987) (citing *Hopper v. Heckler,* 752 F.2d 83, 88 (4th Cir. 1985); *Wilson v. Heckler,* 743 F.2d 218, 222 (4th Cir. 1984); *Grant v. Schweiker,* 699 F.2d 189, 192 (4th Cir. 1993); *Roberts v. Schweiker,* 667 F.2d 1143, 1145 (4th Cir. 1981)). The ALJ noted in his opinion that Surber had not received any long-term treatment for his depression, and, therefore, found that Suber's depression was nonsevere. (R. at 24.) However, this is not a fair representation of the facts in this case. Surber was first diagnosed with depression in December 2004, and the hearing was held on February 3, 2005. It can hardly be expected that he would indeed have evidence of a long-term treatment record for depression with such a short period between the date he was diagnosed with depression and the date of the hearing. Also, the ALJ notes that no treating physician diagnosed Surber with depression. Once again, this is not entirely correct. It appears from the record that a progress note by

---

[2]The Regulations define work in terms of the exertion required. Light work involves lifting up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in the this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling or arm or leg controls. If an individual can perform light work, he can also perform sedentary work. 20 C.F.R. §§ 404.1567(d) and 416.967(b) (2005).

Case 1:05-cv-00076-JPJ-PMS Document 16 Filed 08/08/06 Page 18 of 19 Pageid#: 87

Dr. Fahr indicated that he diagnosed Surber with anxiety and depression. (R. at 462-65.) Further, at the hearing, Surber testified that he was currently seeing Dr. Fahr for his depression and was taking Lexapro for depression. (R. at 53-54.) And, Dr. Fahr noted in his report that Surber's appearance seemed better since he began taking Lexapro. Also, Surber testified at the hearing that one of the reasons that he could not work was because of his depression. (R. at 53-54.) Therefore, under these circumstances this court is of the opinion that Surber has presented substantial evidence of a non-exertional impairment, which was not considered by the ALJ in determining Surber's residual functional capacity. Thus, this court remands Surber's claim to the Commissioner to reconsider the effects of Surber's non-exertional impairment on his residual functional capacity.

## IV. Conclusion

Based on the above, Surber's motion for summary judgment will be overruled and the Commissioner's motion for summary judgment will be overruled. The Commissioner's decision denying benefits will be vacated, and Surber's claim for benefits will be remanded to the Commissioner for further consideration in accordance with this memorandum opinion.

An appropriate order will be entered.

DATED: This 8th day of August, 2006.

SENIOR UNITED STATES DISTRICT JUDGE